# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KARUK TRIBE OF CALIFORNIA,
         *Plaintiff-Appellant,*

         v.

UNITED STATES FOREST SERVICE;
MARGARET BOLAND,
         *Defendants-Appellees,*

THE NEW 49'ERS, INC.; RAYMOND
W. KOONS,
  *Defendants-intervenors-Appellees.*

No. 05-16801

D.C. No.
CV-04-04275-SBA

OPINION

Appeal from the United States District Court
for the Northern District of California
Saundra B. Armstrong, District Judge, Presiding

Argued and Submitted
December 13, 2011—San Francisco, California

Filed June 1, 2012

Before: Alex Kozinski, Chief Judge, Barry G. Silverman,
Susan P. Graber, Kim McLane Wardlaw,
William A. Fletcher, Ronald M. Gould, Richard A. Paez,
Marsha S. Berzon, Milan D. Smith, Jr., Sandra S. Ikuta, and
Mary H. Murguia, Circuit Judges.

Opinion by Judge William A. Fletcher;
Dissent by Judge M. Smith

**COUNSEL**

Roger Flynn and Jeffrey Charles Parsons, WESTERN MIN-ING ACTION PROJECT, Lyons, Colorado, Lynne Saxton, ENVIRONMENTAL LAW FOUNDATION, Oakland, California, James R. Wheaton, PUBLIC INTEREST LAW OFFICE, Oakland, California, for the plaintiff-appellant.

Lane N. McFadden and Brian C. Toth, U.S. DEPARTMENT OF JUSTICE, Washington, D.C., Barclay T. Samford, U.S. DEPARTMENT OF JUSTICE, Denver, Colorado, Charles Michael O'Connor, OFFICE OF THE UNITED STATES ATTORNEY, San Francisco, California, for the defendants-appellees.

Jason Craig Rylander, DEFENDERS OF WILDLIFE, Washington, D.C., for the amicus curiae.

**OPINION**

W. FLETCHER, Circuit Judge:

   We consider whether the U.S. Forest Service must consult with appropriate federal wildlife agencies under Section 7 of

the Endangered Species Act ("ESA") before allowing mining activities to proceed under a Notice of Intent ("NOI") in critical habitat of a listed species. The ESA requires consultation with the Fish and Wildlife Service or the NOAA Fisheries Service for any "agency action" that "may affect" a listed species or its critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). There are two substantive questions before us.

The first is whether the Forest Service's approval of four NOIs to conduct mining in the Klamath National Forest is "agency action" within the meaning of Section 7. Under our established case law, there is "agency action" whenever an agency makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed. The record in this case shows that Forest Service District Rangers made affirmative, discretionary decisions about whether, and under what conditions, to allow mining to proceed under the NOIs.

The second is whether the approved mining activities "may affect" a listed species or its critical habitat. Forest Service regulations require a NOI for all proposed mining activities that "might cause" disturbance of surface resources, which include fisheries and wildlife habitat. 36 C.F.R. §§ 228.4(a), 228.8(e). In this case, the Forest Service approved mining activities in and along the Klamath River, which is critical habitat for threatened coho salmon. The record shows that the mining activities approved under NOIs satisfy the "may affect" standard.

We therefore hold that the Forest Service violated the ESA by not consulting with the appropriate wildlife agencies[1] before approving NOIs to conduct mining activities in coho salmon critical habitat within the Klamath National Forest.

---

[1]The parties appear to assume that if consultation is required under Section 7, it is required with both agencies. Without deciding the question, we also will so assume.

## I.  Background

The Karuk Tribe has inhabited what is now northern California since time immemorial. The Klamath River originates in southeastern Oregon, runs through northern California, and empties into the Pacific Ocean about forty miles south of the California-Oregon border. In northern California, the Klamath River passes through the Six Rivers and Klamath National Forests. The Klamath River system is home to several species of fish, including coho salmon. Coho salmon in the Klamath River system were listed as "threatened" under the ESA in 1997. 62 Fed. Reg. 24,588 (May 6, 1997). The Klamath River system and adjacent streamside riparian zones were designated as critical habitat for coho salmon in 1999. 64 Fed. Reg. 24,049 (May 5, 1999). The Karuk Tribe depends on coho salmon in the Klamath River system for cultural, religious, and subsistence uses.

The rivers and streams of the Klamath River system also contain gold. Commercial gold mining in and around the rivers and streams of California was halted long ago due, in part, to extreme environmental harm caused by large-scale placer mining. *See generally People v. Gold Run Ditch & Mining Co.*, 4 P. 1152 (Cal. 1884) (affirming injunction against hydraulic gold mining because of impacts on downstream rivers); Green Versus Gold: Sources in California's Environmental History 101-40 (Carolyn Merchant ed., 1998) (describing environmental impacts of the California Gold Rush). However, small-scale recreational mining has continued. Some recreational miners "pan" for gold by hand, examining one pan of sand and gravel at a time. Some conduct "motorized sluicing" by pumping water onto streambanks to process excavated rocks, gravel, and sand in a sluice box. As the material flows through the box, a small amount of the heavier material, including gold, is slowed by "riffles" and is then captured in the bottom of the box. The remaining material runs through the box and is deposited in a tailings pile. Finally, some recreational miners conduct mechanical "suc-

tion dredging" within the streams themselves. These miners use gasoline-powered engines to suck streambed material up through flexible intake hoses that are typically four or five inches in diameter. The streambed material is deposited into a floating sluice box, and the excess is discharged in a tailings pile in or beside the stream. Dredging depths are usually about five feet, but can be as great as twelve feet.

The Karuk Tribe contends that these mining activities adversely affect fish, including coho salmon, in the Klamath River system. The Tribe challenges the Forest Service's approval of four NOIs to conduct mining activities in coho salmon critical habitat in the Klamath National Forest, without first consulting with federal wildlife agencies pursuant to Section 7 of the ESA.

### A.   Mining Regulations

Under the General Mining Law of 1872, a private citizen may enter public lands for the purpose of prospecting and mining. 30 U.S.C. § 22. The Organic Administration Act of 1897 extended the Mining Law to the National Forest system but authorized the Secretary of Agriculture to regulate mining activities in the National Forests to protect the forest lands from destruction and depredation. 16 U.S.C. §§ 482, 551. The Act specified that prospectors and miners entering federal forest lands "must comply with the rules and regulations covering such national forests." *Id.* § 478. We have repeatedly upheld the Forest Service's authority to impose reasonable environmental regulations on mining activities in National Forests, so long as they do not prohibit or impermissibly encroach on legitimate mining uses. *See, e.g.*, *United States v. Shumway*, 199 F.3d 1093, 1106-07 (9th Cir. 1999); *Clouser v. Espy*, 42 F.3d 1522, 1529-30 (9th Cir. 1994); *United States v. Weiss*, 642 F.2d 296, 298-99 (9th Cir. 1981).

In 1974, the Forest Service promulgated regulations to minimize the adverse environmental impacts of mining activities

in National Forests. 39 Fed. Reg. 31,317 (Aug. 28, 1974); 36 C.F.R. § 228.1 (2004). The regulations establish three different categories of mining, based on whether the proposed activities "will not cause," "might cause," or "will likely cause" significant disturbance of surface resources, which include fisheries and wildlife habitat. 36 C.F.R. §§ 228.4(a), 228.8(e). The first category, *de minimis* mining activities that "will not cause" significant disturbance of surface resources, may proceed without notifying the Forest Service or obtaining the agency's approval or authorization. *Id.* § 228.4(a)(1), (2)(ii). The third category, mining activities that "will likely cause" significant disturbance of surface resources, may not proceed until the Forest Service approves a Plan of Operations ("Plan") submitted by the miner. *Id.* § 228.4(a). A Plan requires relatively detailed information, including "the approximate location and size of areas where surface resources will be disturbed" and "measures to be taken to meet the requirements for environmental protection." *Id.* § 228.4(c). Within 30 days of receiving a Plan, or 90 days if necessary, the Forest Service must approve the proposed Plan or notify the miner of any additional environmental conditions necessary to meet the purpose of the regulations. *Id.* § 228.5(a).

At issue in this appeal is the middle category of mining activities: those that "might cause" disturbance of surface resources. *Id.* § 228.4(a). Forest Service mining regulations require that any person proposing such activities must submit a Notice of Intent to operate, or NOI, to the appropriate District Ranger. *Id.* A NOI is less detailed than a Plan. It need only contain information "sufficient to identify the area involved, the nature of the proposed operations, the route of access to the area of operations and the method of transport." *Id.* § 228.4(a)(2)(iii). Within 15 days of receiving a NOI, the District Ranger must notify the miner whether a Plan is required. *Id.* The Ranger will require a Plan if, in his discretion, he determines that the operation "will likely cause" significant disturbance of surface resources. *Id.* § 228.4(a).

The Forest Service revised its regulations in 2005 to clarify when a NOI or Plan is required. *See* 70 Fed. Reg. 32,713 (June 6, 2005). The revised regulations provide examples of *de minimis* mining activities — such as gold panning, metal detecting, and mineral sampling — that "will not cause" significant disturbance of surface resources and thus require neither a NOI or Plan. 36 C.F.R. § 228.4(a)(1)(ii) (2011). The revised regulations also clarify that a NOI is required only for proposed mining activities that might cause "significant" disturbance of surface resources. *Id.* § 228.4(a) (2011). The parties agree that the 2005 revisions do not materially affect the issues on appeal. However, because the Karuk Tribe challenges the Forest Service's approval of NOIs during the 2004 mining season, our citations to subsections of 36 C.F.R. § 228 are to the 2004 version of the Forest Service regulations, unless otherwise noted.

## B. 2004 Mining Season

Before the start of the 2004 mining season, representatives of the Karuk Tribe expressed concern to the Forest Service about the effects of suction dredge mining on fisheries in the Klamath River system. The District Ranger for the Happy Camp District of the Klamath National Forest, Alan Vandiver, responded by organizing meetings that included Tribal leaders, miners, and district officials. Vandiver also consulted with Forest Service biologists Bill Bemis and Jon Grunbaum. Vandiver wrote the following memorandum on May 24, 2004:

> On April 20th a meeting was held in Orleans to discuss possible fisheries issues relating to dredging. A number of opinions were shared on the possible effects. . . .
>
> Following the Orleans meeting I asked our District Fisheries biologists, Bill Bemis and Jon Grunbaum, to develop recommendations, for my

consideration, for the upcoming dredging season. They were not able to come to agreement on a list of fisheries recommendations. Their opinions varied widely on the effect of dredge operations on fisheries. I identified three key fisheries issues specific to the Happy Camp District[:] cold water refugia areas in the Klamath River, the intensity of dredge activities and the stability of spawning gravels in some portions of Elk Creek. These issues I used to help develop a threshold for determining a significant level of surface disturbance. I felt it was important from a cumulative effects standpoint to determine a threshold of dredge density on the streams, as well as identify the critical cold water refugia areas. . . .

. . . I discussed at length with Bill [Bemis] and Jon [Grunbaum] the effect on fisheries if the dredge activity was concentrated or dispersed over the length of the river. Concentrated use would result in longer river stretches without dredge activity and therefore less possible impacts to fisheries in the longer stretches. Distributed use would result in dispersed possible effects over the entire length of the river. . . . Considering the limited dredge operations in cold water refugia areas and the limited dredge access, I developed a threshold of 10 dredges per mile on the Klamath River and 3 dredges per mile on the Klamath tributaries. My thinking was the larger Klamath River, excluding the cold water refugia, could accommodate more dredge density with less impact than the smaller tributaries.

The first of the four NOIs challenged in this appeal was submitted by the New 49'ers, a recreational mining company. The New 49'ers own and lease numerous mining claims in and around the Klamath and Six Rivers National Forests. On May 17, 2004, District Ranger Vandiver met with two repre-

sentatives of the New 49'ers and other interested parties. Based on his earlier consultation with Bemis and Grunbaum, Vandiver instructed the New 49'ers on "three primary issues."

First, Vandiver instructed the New 49'ers that areas of cold water habitat, or "cold water refugia," must be maintained within 500 feet of the mouths of twenty-two named creeks that feed into the Klamath River. Second, he instructed them that tailings piles must be raked back into the "dredge holes in critical spawning areas" of Elk Creek "in a timely manner as operations proceed, but no later than the end of the season." Third, he instructed them that there could be no more than ten dredges per mile on the Klamath River, and no more than three dredges per mile on Klamath tributaries.

On May 24, 2004, a week after their meeting with Vandiver, the New 49'ers submitted an eight-page, single-spaced NOI for mining activities in the Happy Camp District during the 2004 season. The NOI proposed suction dredge mining in approximately 35 miles of the Klamath River and its tributaries. The NOI also proposed motorized sluicing within the mean high water mark adjacent to the streams. In accordance with Vandiver's instructions, the NOI specified that no dredging would occur in specified cold water refugia in the summer and early fall, that dredging holes would be filled in coho salmon spawning grounds on Elk Creek, and that dredge density would not exceed ten dredges per mile on the Klamath River and three dredges per mile on its tributaries.

On May 25, Vandiver sent the New 49'ers a letter approving their NOI. He wrote: "You may begin your mining operations when you obtain all applicable State and Federal permits. This authorization expires December 31, 2004." On May 26, Bemis sent a "Note to the File" stating:

> The Notice of Intent (NOI) for the new 49'ers this year has an intensity of approximately 40 dredges over the 35 miles of the Klamath covered by their

claims. They have agreed to a density of no more than 10 dredges in any one-mile at anytime. The new 49'ers have agreed to avoid the area around tributaries to the Klamath Rivers. The club has agreed to pull back dredging tailings in a critical reach within Elk Creek. These agreements and others explained in the NOI should reduce the impacts to anadromous fisheries on the Happy Camp Ranger District.

The second challenged NOI was submitted by Nida Johnson, an individual miner who planned to mine thirteen claims. She submitted the NOI on May 29, 2004, noting that it was the "result of a meeting at the Happy Camp U.S.F.S. May 25, 2004." The NOI stated that she planned to use a four- or five-inch suction dredge. In an attachment, she wrote that "[d]redge tailings piles in Independence Cr[eek] will be leveled." In a second attachment signed June 4, 2004, she wrote:

> As recommended by the Forest Service, no dredging will be conducted on the Klamath River within 500 feet above and below the mouth of Independence Creek between June 15th and October 15th.

> I totally disagree with these distances and believe that dredging is actually beneficial to fish survival, but I am willing to follow these recommendations in order to continue with my mining operations.

Vandiver approved the NOI on June 14.

The third NOI was submitted by Robert Hamilton, an individual miner who planned to mine four claims. He submitted his NOI on June 2, 2004. The NOI stated that he planned to use a four-inch suction dredge for about two weeks during July. Under the heading "Precautions," he wrote that he would limit dredge density to three per mile, and that "[t]ailings will be returned to dredge hole if possible in shal-

low areas or spread over [a] large area in deep areas." Vandiver approved the NOI on June 15.

The fourth NOI was submitted by Ralph Easley, an individual miner who planned to mine a single claim. He submitted his NOI on June 14. The NOI stated that he planned to use a four-inch suction dredge from the beginning of July to the end of September. He wrote that the "[d]redge tailings will be raked back into dredge holes." Vandiver approved the NOI on June 15.

The Forest Service never consulted with the Fish and Wildlife Service or NOAA Fisheries Service before approving the four NOIs.

In addition to the four NOIs specifically challenged in this appeal, the record includes other NOIs for mining activities during the 2004 season in the Six Rivers and Klamath National Forests. These NOIs provide important information about the Forest Service's practices with respect to mining pursuant to NOIs.

First, on April 26, 2004, the New 49'ers submitted another eight-page, single-spaced NOI that proposed suction dredging and motorized sluicing in and along the Salmon River in the Orleans District of the Six Rivers National Forest. On May 13, Acting Forest Supervisor William Metz refused to approve the NOI. Metz wrote:

> There is an important cold water refugia at the mouth of Wooley Creek that was discussed on the April 23, 2004 field trip as needing protection. This was not mentioned in your NOI. Protection of this refugia is critical to the survival of migrating anadromous fish.

Metz wrote further:

Due to the anadromous fisheries in the lower Salmon River the stability of spawning gravels for fish redds [spawning nests] is a major concern. Redds can be lost if loose tailing piles erode away by stream course action while eggs are still present. . . . Any resubmitted NOI or Plan of Operation needs to address the need to flatten tailings piles and rolling large dislodged rocks on the edge of the dredged holes back into the holes.

On May 24, the New 49'ers submitted a revised NOI for mining in the Orleans District. Dave McCracken, General Manager of the New 49'ers, wrote in a cover letter to the NOI, "If this Notice does not adequately address your concerns [then] I would suggest that we arrange an on-the-ground meeting at the earliest possible time." On May 29, anticipating that Metz would not approve the revised NOI, the New 49'ers withdrew it. McCracken wrote to Metz:

From the substantial amount of dialog we have had with your office, other District offices, the Supervisor's office, Karuk Tribal leaders, active members of the Salmon River Restoration Council and others within local communities over the past several months, it has become increasingly clear that there are too many sensitive issues for us to try and manage a group mining activity along the Salmon River at this time.

Second, on April 28, 2004, the New 49'ers submitted a seven-page, single-spaced NOI to conduct suction dredging and motorized sluicing in the Scott River District of the Klamath National Forest. The NOI proposed an estimated fifteen dredges along fifteen miles of streams, with "[d]ensities of above five dredges per 100 yards . . . not anticipated." The NOI made a general commitment concerning mining in cold water refugia at the mouths of tributaries, stating that the New 49'ers would work with the Forest Service to identify these

areas and "to adjust their operation to prevent disturbance and stress to these fish during critical time periods." Unlike the NOIs for mining in the Happy Camp and Orleans Districts, the NOI for the Scott River District made no provision for raking tailings piles back into dredge holes. On May 10, District Ranger Ray Haupt refused to approve the NOI, but for reasons unrelated to protection of fisheries. Haupt wrote:

> I am unable to allow your proposed mining operations for the [Scott River District] under a NOI because of your bonded campsite which allows your club members to camp (occupancy) longer than the 14 day camping limit. Your current Plan of Operations allows for extended camping (longer than 14 days) for your members, while they are actively engaged in mining. I am approving your mining operations for 2004 under a Plan of Operations with the following conditions . . . .

None of the conditions in the approved Plan related to specific cold water refugia or tailings piles.

### C.   Procedural Background

The Tribe brought suit in federal district court alleging that the Forest Service violated the ESA, the National Environmental Policy Act ("NEPA"), and the National Forest Management Act ("NFMA") when it approved the four NOIs to conduct mining in and along the Klamath River in the Happy Camp District. *Karuk Tribe of Cal. v. U.S. Forest Serv.* ("*Karuk I*"), 379 F. Supp. 2d 1071, 1085 (N.D. Cal. 2005). The Tribe sought declaratory and injunctive relief. The New 49'ers and Raymond Koons, an individual who leases several mining claims to the New 49'ers on the Klamath River, intervened as defendants in the suit (collectively "the Miners"). *Id.* at 1077. Initially, the Tribe also challenged five Plans of Operations approved by the Forest Service during the 2004 mining season, but the Tribe dropped those claims in April

2005 after the agency agreed in a stipulated settlement that it violated the ESA and NEPA when it approved the Plans. In other words, the Forest Service agreed that it had a duty under the ESA to consult with the appropriate wildlife agencies, and under NEPA to prepare additional environmental review documents, before approving the Plans.

In July 2005, the district court denied the Tribe's motion for summary judgment and ruled against the Tribe on all remaining claims. *Id.* at 1103. Briefing on appeal was stayed by agreement of the parties until we decided a case involving suction dredge mining in the Siskiyou National Forest in Oregon. *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545 (9th Cir. 2009). When briefing resumed, the Tribe pursued only the ESA claim, arguing that the Forest Service violated its duty to consult with the expert wildlife agencies before approving the four NOIs.

In April 2011, a divided panel of this court affirmed the district court's denial of summary judgment, holding that the Forest Service's decision to allow proposed mining activities to proceed pursuant to a NOI did not constitute "agency action" under the ESA. *Karuk Tribe v. U.S. Forest Serv.* ("*Karuk II*"), 640 F.3d 979 (9th Cir. 2011). We agreed to rehear the case en banc. 658 F.3d 953 (9th Cir. 2011).

## II.   Standard of Review

We review *de novo* a district court's denial of summary judgment. *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1041 (9th Cir. 2011). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007). Because this is a record review case, we may direct that summary judgment be granted to either party based upon our review of the administrative record. *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

An agency's compliance with the ESA is reviewed under the Administrative Procedure Act ("APA"). *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004). Under the APA, a court may set aside an agency action if the court determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Although we defer to an agency's interpretation of its own regulations and the statutes it is charged with administering, *Cal. Dep't of Water Res. v. Fed. Energy Regulatory Comm'n*, 489 F.3d 1029, 1035-36 (9th Cir. 2007), an agency's interpretation of a statute outside its administration is reviewed *de novo*, *Am. Fed'n of Gov't Emps. v. Fed. Labor Relations Auth.*, 204 F.3d 1272, 1274-75 (9th Cir. 2000).

## III.   Discussion

### A.   Mootness

As a preliminary matter, we must decide whether intervening events have rendered the Karuk Tribe's claims for declaratory and injunctive relief moot. "The Supreme Court has emphasized that the doctrine of mootness is more flexible than other strands of justiciability doctrine." *Jacobus v. Alaska*, 338 F.3d 1095, 1103 (9th Cir. 2003). The Court has instructed that "harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). In *Laidlaw*, the Court cautioned that dismissing a case as moot in the late stages of appeal could be "more wasteful than frugal." *Id.* at 191-92. Doing so is justified only when it is "absolutely clear" that the litigant no longer has "any need of the judicial protection that it sought." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 224 (2000) (per curiam). The party asserting mootness bears a "heavy" burden; a case is not moot if *any* effective relief may be granted. *Forest Guardians v. Johanns*, 450 F.3d

455, 461 (9th Cir. 2006) (citing *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988)).

**[1]** In this appeal, the Tribe challenges the Forest Service's approval of four NOIs allowing mining activities in and along the Klamath River during the 2004 mining season. Pursuant to the Forest Service letters approving the four NOIs, they all expired on December 31, 2004. However, we conclude that the Tribe's claims are justiciable under the "capable of repetition, yet evading review" exception to the mootness doctrine. The exception applies when (1) the duration of the challenged action is too short to allow full litigation before it ceases or expires, and (2) there is a reasonable expectation that the plaintiffs will be subjected to the challenged action again. *Feldman v. Bomar*, 518 F.3d 637, 644 (9th Cir. 2008).

We have repeatedly held that similar actions lasting only one or two years evade review. *See, e.g.*, *Natural Res. Def. Council, Inc. v. Evans*, 316 F.3d 904, 910 (9th Cir. 2003); *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 856 (9th Cir. 1999); *Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 939 (9th Cir. 1987). Although the Forest Service mining regulations do not specify that NOIs must expire after a certain period, the record in this case reveals that the agency allows seasonal mining activities pursuant to NOIs for only one year at a time. Accordingly, the challenged NOI approvals evade review because they are too short in duration for a plaintiff to complete litigation before the mining activities end.

**[2]** The controversy is capable of repetition because the Tribe has shown "a reasonable expectation that the Forest Service will engage in the challenged conduct again." *Alaska Ctr. for the Envt.*, 189 F.3d at 857. During the pendency of this appeal, and as recently as December 2011, the Forest Service has continued to approve NOIs allowing mining activities in coho salmon critical habitat along the Klamath River without consultation under Section 7 of the ESA. The Tribe

has demonstrated a commitment to challenging these approvals. *See Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174 (9th Cir. 2002) (finding a controversy capable of repetition where there is "a reasonable expectation that [the parties] will again litigate the issue").

The Forest Service and Miners argue that the controversy is moot because the California legislature has imposed a state-wide moratorium on suction dredge mining. Cal. Fish & Game Code § 5653.1 (2011). No suction dredge mining may occur in the Six Rivers or Klamath National Forests until the temporary state ban expires. The moratorium is a result of a state court lawsuit filed by the Karuk Tribe against the California Department of Fish and Game ("CDFG") in 2005. By its terms, the moratorium will expire on June 30, 2016, or when the CDFG certifies that five specified conditions have been satisfied, whichever is earlier. *Id.* § 5653.1(b). Among other conditions, CDFG must promulgate new state suction dredge mining regulations that "fully mitigate all identified significant environmental impacts." *Id.* § 5653.1(b)(4).

The moratorium does not moot this appeal for two reasons. First, the suction dredge moratorium does not prohibit other mining activities at issue in this case. Throughout this litigation, the Tribe has challenged the Forest Service's approval of NOIs to conduct not only suction dredge mining in the Klamath River, but also mining activities outside the stream channel, such as motorized sluicing. *See, e.g.*, *Karuk I*, 379 F. Supp. 2d at 1085 ("Plaintiff's Second Amended Complaint seeks declaratory and injunctive relief arising from Defendants' allegedly improper management of suction dredge *and other mining operations* in waterways *and riparian areas* within the Klamath National Forest." (emphasis added)). District Rangers in the Klamath National Forest have continued to approve NOIs allowing these other mining activities in coho salmon critical habitat along the shores of the Klamath River. The Forest Service argues that the Tribe has not established a cognizable injury resulting from these activities.

However, the district court specifically held that the Tribe had standing based on "suction dredge mining *and other mining operations* occurring in *and along* the Klamath River and its tributaries." *Id.* at 1092 (emphasis added). Because the court found that these operations "could impact the Tribe's ability to enjoy the spiritual, religious, subsistence, recreational, wildlife, and aesthetic qualities of the areas affected by the mining operations," it concluded that "any alleged failure of the Forest Service to properly regulate mining operations could directly and adversely harm the Tribe and its members." *Id.* We agree.

Second, even if these other mining activities were not at issue, the state's moratorium on suction dredge mining is only temporary. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 100-01 & n.4 (1983) (open-ended, temporary moratorium did not moot a claim for injunctive relief because "the moratorium by its terms is not permanent"); *W. Oil & Gas Ass'n v. Sonoma Cnty.*, 905 F.2d 1287, 1290-91 (9th Cir. 1990) (federal moratorium on oil drilling off the California coast did not moot a challenge to local land use ordinances that regulated related onshore facilities). The Forest Service and Miners argue that, once the moratorium expires, any future suction dredging in the Klamath River will occur under a revised state permitting regime. But changes to the state regulations are immaterial to the legal controversy at issue in this appeal. In *California Coastal Commission v. Granite Rock Co.*, 480 U.S. 572, 577-78 (1987), the plaintiff mining company's five-year Plan of Operations had expired during the course of litigation, and the Supreme Court recognized that the federal and state regulatory landscape might change before the company submitted a new Plan to the Forest Service. But the Court held that the controversy was capable of repetition yet evading review, and thus not moot, because "dispute would continue" over whether the state could enforce future permit conditions. *Id.* at 578. Similarly, here, despite any changes to the state suction dredge regulations, "dispute would continue" over whether the Forest Service can approve NOIs allowing min-

ing activities in critical habitat of a listed species without con-
sultation under the ESA. Declaratory judgment in the Tribe's
favor would "ensure that the Forest Service . . . fulfills its
duty under the ESA to consult." *Forest Guardians*, 450 F.3d
at 462.

**[3]** A case becomes moot on appeal if " 'events have com-
pletely and irrevocably eradicated the effects of the alleged
violation,' " and there is " 'no reasonable . . . expectation that
the alleged violation will recur.' " *Am. Cargo Transp., Inc. v.
United States*, 625 F.3d 1176, 1179 (9th Cir. 2010) (quoting
*Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979)). Here,
the state moratorium neither completely (because it does not
prohibit other mining activities) nor irrevocably (because it is
only temporary) eradicated the effects of the Forest Service's
alleged ESA violations. The agency's continued approval of
NOIs allowing mining activities in coho salmon critical habi-
tat along the Klamath River, without consultation under the
ESA, makes clear that the alleged violations will recur.

Because we conclude that this appeal is not moot, we pro-
ceed to the merits.

### B.   Consultation Under the Endangered Species Act

**[4]** We have described Section 7 as the "heart of the ESA."
*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495
(9th Cir. 2011). Section 7 requires federal agencies to ensure
that none of their activities, including the granting of licenses
and permits, will jeopardize the continued existence of listed
species or adversely modify a species' critical habitat. *Babbitt
v. Sweet Home Chapter*, 515 U.S. 687, 692 (1995) (citing 16
U.S.C. § 1536(a)(2)).

**[5]** Section 7 imposes on all agencies a duty to consult
with either the Fish and Wildlife Service or the NOAA Fish-
eries Service before engaging in any discretionary action that
may affect a listed species or critical habitat. *Turtle Island*

*Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003). The purpose of consultation is to obtain the expert opinion of wildlife agencies to determine whether the action is likely to jeopardize a listed species or adversely modify its critical habitat and, if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts. *Id.* The consultation requirement reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).

Section 7(a)(2) of the ESA provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "*agency action*") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species . . . .

16 U.S.C. § 1536(a)(2) (emphasis added).

**[6]** Regulations implementing Section 7 provide:

> Each Federal agency shall review its actions at the earliest possible time to determine whether any action *may affect* listed species or critical habitat. If such a determination is made, formal consultation is required . . . .

50 C.F.R. § 402.14(a) (emphasis added).

We discuss the "agency action" and "may affect" requirements in turn.

## 1.    Agency Action

**[7]** Section 7 of the ESA defines agency action as "any action authorized, funded, or carried out by [a federal] agency." 16 U.S.C. § 1536(a)(2). The ESA implementing regulations provide:

> Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas. Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02. There is "little doubt" that Congress intended agency action to have a broad definition in the ESA, and we have followed the Supreme Court's lead by interpreting its plain meaning "in conformance with Congress's clear intent." *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054-55 (9th Cir. 1994) (citing *Tenn. Valley Auth.*, 437 U.S. at 173).

The ESA implementing regulations limit Section 7's application to " 'actions in which there is discretionary Federal involvement or control.' " *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 666 (2007) (quoting 50 C.F.R. § 402.03). The Supreme Court explained that this limitation harmonizes the ESA consultation requirement with other statutory mandates that leave an agency no discretion to consider the protection of listed species. *Home Builders*, 551 U.S. at 665-66.

Our "agency action" inquiry is two-fold. First, we ask whether a federal agency affirmatively authorized, funded, or

carried out the underlying activity. Second, we determine whether the agency had some discretion to influence or change the activity for the benefit of a protected species.

### a.    Affirmative Authorization

We have repeatedly held that the ESA's use of the term "agency action" is to be construed broadly. *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1108 (9th Cir. 2006); *Turtle Island*, 340 F.3d at 974; *Pac. Rivers*, 30 F.3d at 1055. Examples of agency actions triggering Section 7 consultation include the renewal of existing water contracts, *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998), the creation of interim management strategies, *Lane Cnty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 293-94 (9th Cir. 1992), and the ongoing construction and operation of a federal dam, *Tenn. Valley Auth.*, 437 U.S. at 173-74. We have also required consultation for federal agencies' authorization of private activities, such as the approval and registration of pesticides, *Wash. Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1031-33 (9th Cir. 2005), and the issuance of permits allowing fishing on the high seas, *Turtle Island*, 340 F.3d at 974.

**[8]** An agency must consult under Section 7 only when it makes an "affirmative" act or authorization. *Cal. Sportfishing Prot. Alliance v. Fed. Energy Regulatory Comm'n*, 472 F.3d 593, 595, 598 (9th Cir. 2006); *Matejko*, 468 F.3d at 1108. Where private activity is proceeding pursuant to a vested right or to a previously issued license, an agency has no duty to consult under Section 7 if it takes no further affirmative action regarding the activity. *Cal. Sportfishing*, 472 F.3d at 595, 598-99; *Matejko*, 468 F.3d at 1107-08 ("'inaction' is not 'action' for section 7(a)(2) purposes"). Similarly, where no federal authorization is required for private-party activities, an agency's informal proffer of advice to the private party is not "agency action" requiring consultation. *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1074-75 (9th Cir. 1996); *see also*

*Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) (Section 7 applies to private activity "only to the extent the activity is dependent on federal authorization").

[9] Here, the Forest Service's mining regulations and actions demonstrate that the agency affirmatively authorized private mining activities when it approved the four challenged NOIs. By regulation, the Forest Service must authorize mining activities before they may proceed under a NOI. The regulations require that a miner submit a NOI for *proposed* mining activities. 36 C.F.R. § 228.4(a) ("[A] notice of intention to operate is required from any person proposing to conduct operations which might cause disturbance of surface resources."); *see also* 70 Fed. Reg. at 32728 (describing the requirement for "submission of a notice of intent to operate *before an operator conducts proposed operations*" (emphasis added)). By contrast, a miner conducting *de minimis* mining activities, such as gold panning or mineral sampling, may proceed without submitting anything to, or receiving anything from, the Forest Service. 36 C.F.R. § 228.4(a)(1), (2)(ii). When a miner submits a NOI, the regulations also require that the Forest Service inform the miner within 15 days whether the mining may proceed under the NOI or whether he must prepare a Plan of Operations instead. *Id.* § 228.4(a)(2)(iii). In other words, when a miner proposes to conduct mining operations under a NOI, the Forest Service either affirmatively authorizes the mining under the NOI or rejects the NOI and requires a Plan instead.

[10] The actions of both the Forest Service and the miners in this case accord with the understanding that the agency affirmatively authorizes mining activities when it approves a NOI. The District Ranger's letter approving the New 49'ers NOI for the 2004 mining season stated, "You may begin your mining operations when you obtain all applicable State and Federal permits. This authorization expires December 31, 2004." The District Ranger's letters approving six NOIs for the 2010, 2011, and 2012 mining seasons stated, "I am allow-

ing your proposed mining activities . . . under a NOI with the following conditions." Another District Ranger stated in a letter rejecting a NOI for the 2004 season that he was "unable to allow your proposed mining operations . . . under a NOI." The miners also understood that they were seeking authorization. In one instance, the New 49'ers sent a letter stating: "We would like to make a correction to our Notice of Intent which was recently approved on May 25, 2004." In another instance, a miner amended her NOI to accommodate Forest Service protective criteria about cold water refugia. She wrote, "I totally disagree with these distances and believe that dredging is actually beneficial to fish survival, but I am willing to follow these recommendations in order to continue with my mining operations."

**[11]** *Cal. Sportfishing*, *Matejko*, and *Marbled Murrelet* involved private-party activities that required no affirmative act or authorization by the agency. The private parties in those cases were not required to submit proposals to the agency, and the agency was not required to respond affirmatively to the private parties. Here, by contrast, a person proposing to conduct mining activities that might cause disturbance of surface resources must submit a NOI for approval, and the District Ranger must respond within 15 days. 36 C.F.R. § 228.4(a)(2)(iii) ("[T]he District Ranger will, within 15 days of [receiving a NOI], notify the operator whether a plan of operations is required."). The 2005 amendments to the mining regulations changed the wording slightly, stating that the District Ranger will notify the operator within 15 days "*if* approval of a plan of operations is required." *Id.* § 228.4(a)(2) (2011) (emphasis added). The Forest Service explained in its commentary to the amendments that it intended no substantive change when it reworded the requirement. *See* 70 Fed. Reg. at 32,721. In its commentary, the Forest Service also quoted its earlier explanation that the District Ranger will notify the prospective miner within 15 days "as to *whether or not* an operating plan will be necessary." 70 Fed. Reg. at 32,728 (emphasis added); *see also id.* at 32,729-30 (describ-

ing the miner's possible remedies if a District Ranger does not "comply with the requirement to respond [to a NOI] within 15 days"). In other words, the Forest Service must decide whether or not to authorize mining pursuant to the NOI and affirmatively notify the miner of its decision either way.

**[12]** The District Rangers affirmatively responded to all six non-withdrawn NOIs in the record for the 2004 mining season. The Forest Service approved four of them and denied two. The District Ranger for the Happy Camp District also affirmatively approved all six NOIs for the 2010, 2011, and 2012 mining seasons. There is no NOI in the record, other than the one that was withdrawn, that the Forest Service did not affirmatively act to approve or deny. Thus, the Forest Service's mandatory, affirmative response to a NOI clearly distinguishes this case from *Cal. Sportfishing*, 472 F.3d at 597-98, and *Matejko*, 468 F.3d at 1108-10, where we held that there is no "agency action" or duty to consult under the ESA if the agency takes no affirmative act. *Marbled Murrelet* is also inapposite because the Forest Service does not "merely provide[ ] advice" to a prospective miner when the agency approves a NOI for proposed mining activities. 83 F.3d at 1074.

**[13]** In *Siskiyou*, 565 F.3d at 554, we held that the Forest Service's approval of a NOI to conduct suction dredge mining constitutes "final agency action" under the APA. This holding confirms that a NOI approval is not merely advisory. Rather, it " 'mark[s] the consummation of the agency's decision making process' " and is an action " 'from which legal consequences will flow.' " *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 930 (9th Cir. 2010) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Further evidence that the Forest Service authorizes, rather than advises, proposed mining activities when it approves a NOI is provided by the Forest Service's rejection of two NOIs in the record in this case. In one instance, the District Ranger wrote that he was "unable to allow your proposed mining operations . . .

under a NOI." In the other, the District Ranger rejected the NOI because it did not comply with criteria for the protection of critical fisheries habitat. Finally, the Forest Service periodically inspects mining operations to determine if they are complying with the regulations. 36 C.F.R. § 228.7. During the 2004 mining season, the Forest Service monitored miners' compliance with the protective criteria set forth in the approved NOIs, something the agency would not do if the approval merely constituted unenforceable, nonbinding advice. Thus, unlike in *Marbled Murrelet*, 83 F.3d at 1074, where there was "no evidence" that the agency had the power to enforce the advice that it gave, here the record indicates that the Forest Service can enforce the NOI conditions.

The Forest Service and the Miners contend that the underlying mining activities are authorized by the General Mining Law, rather than by the agency's approval of the NOIs. But private activities can and do have more than one source of authority, and more than one source of restrictions on that authority. *See* 50 C.F.R. § 402.02 (agency "action" under the ESA includes all private activities authorized "in part" by a federal agency). The Mining Law and the Organic Act give miners "a statutory right, not mere privilege," to enter the National Forests for mining purposes, 39 Fed. Reg. at 31,317, but Congress has subjected that right to environmental regulation. *See* 16 U.S.C. § 478 (miners entering federal forest lands "must comply with the rules and regulations covering such national forests"); *see also United States v. Locke*, 471 U.S. 84, 104-05 (1985) (the right to mine on public lands is a "unique form of property" over which the federal government "retains substantial regulatory power" (internal quotation marks omitted)). The Forest Service concedes that its approval of a Plan of Operations "authorizes" mining activities and constitutes an "agency action" under the ESA, even though the Mining Law presumably "authorized" those activities as well. The same logic extends to the agency's approval of a NOI.

The Forest Service contends that approval of a NOI is merely a decision not to regulate the proposed mining activities. *See* 70 Fed. Reg. at 32,720; *id.* at 32,728 ("a notice of intent to operate was not intended to be a regulatory instrument"). But the test under the ESA is whether the agency *authorizes*, funds, or carries out the activity, at least in part. 50 C.F.R. § 402.02 (emphasis added). As shown above, the Forest Service authorizes mining activities when it approves a NOI and affirmatively decides to allow the mining to proceed. Moreover, the record in this case demonstrates that the Forest Service controls mining activities through the NOI process, whether or not such control qualifies a NOI as a "regulatory instrument." As discussed below, the Forest Service formulated precise criteria for the protection of coho salmon, communicated those criteria to prospective miners, and approved the miners' activities under a NOI only if they strictly conformed their mining to the specified criteria. The Forest Service also monitored the miners' compliance with those criteria.

Finally, the Forest Service and the Miners point to our holding in *Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1988), which involved Bureau of Land Management ("BLM") mining regulations similar to the Forest Service regulations at issue in this appeal. In *Penfold*, we held that BLM's review of "notice" mining operations did not constitute a "major federal action" triggering the need for an environmental assessment under NEPA. *Id.* at 1313-14. Although the "major federal action" standard under NEPA is similar to the more liberal "agency action" standard under the ESA, *Marbled Murrelet*, 83 F.3d at 1075, the terms are not interchangeable. In *Penfold*, 857 F.2d at 1313-14, we held that BLM's review of notice mines *was* a "federal action" — albeit, a "marginal" instead of a "major" action. Under Section 7 of the ESA, a federal agency action need not be "major" to trigger the duty to consult. It need only be an "agency action." Thus, *Penfold* cuts against rather than in favor of the Forest Service and the Miners.

**[14]** In sum, the Forest Service's approval of the four challenged NOIs constituted agency action under Section 7 of the ESA.

### b.    Discretionary Involvement or Control

**[15]** The ESA implementing regulations provide that Section 7 applies only to actions "in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. There is no duty to consult for actions "that an agency is *required* by statute to undertake once certain specified triggering events have occurred." *Home Builders*, 551 U.S. at 669 (emphasis in original); *id.* at 672-73 (no duty to consult where Clean Water Act required Environmental Protection Agency ("EPA") to transfer regulatory authority to a state upon satisfaction of nine specified criteria). However, to avoid the consultation obligation, an agency's competing statutory mandate must require that it perform specific nondiscretionary acts rather than achieve broad goals. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 928-29 (9th Cir. 2008). An agency "cannot escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives." *Wash. Toxics*, 413 F.3d at 1032. The competing statutory objective need only leave the agency "some discretion." *Houston*, 146 F.3d at 1126.

To trigger the ESA consultation requirement, the discretionary control retained by the federal agency also must have the capacity to inure to the benefit of a protected species. *Turtle Island*, 340 F.3d at 974-75; *Ground Zero Ctr. for Nonviolent Action v. U.S. Dep't of the Navy*, 383 F.3d 1082, 1092 (9th Cir. 2004) (no duty to consult where Navy lacked discretion to cease missile operations for the protection of listed species). If an agency cannot influence a private activity to benefit a listed species, there is no duty to consult because "consultation would be a meaningless exercise." *Sierra Club*, 65 F.3d at 1508-09 (no duty to consult for approval of logging

roads where, pursuant to a prior right-of-way agreement, BLM retained discretion over only three specified criteria, none of which related to protecting listed species); *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1081-82 (9th Cir. 2001) (no duty to reinitiate consultation for previously issued permits where Fish and Wildlife Service lacked discretion to add protections for newly listed species). The relevant question is whether the agency *could* influence a private activity to benefit a listed species, not whether it *must* do so. *Turtle Island*, 340 F.3d at 977.

**[16]** Here, the Forest Service's mining regulations and actions demonstrate that the decision whether to approve a NOI is a discretionary determination through which the agency can influence private mining activities to benefit listed species. In *Siskiyou*, 565 F.3d at 548, we held that the applicable mining regulation "confers discretionary authority on district rangers" to determine whether mining activities may proceed under a NOI. We noted that the Forest Service's commentary to the 2005 amendments "emphasize[d] the discretionary elements of the regulation." *Id.* at 557 n.11. In that commentary, the Forest Service acknowledged that it has " 'broad discretion to regulate the manner in which mining activities are conducted on the national forest lands.' " 70 Fed. Reg. at 32,720 (quoting *Freese v. United States*, 6 Cl. Ct. 1, 14 (1984), *aff'd mem.*, 770 F.2d 177 (Fed. Cir. 1985)).

The agency's exercise of discretion under the mining regulations also may influence the mining activities to protect a listed species. The overriding purpose of the regulations is "to minimize [the] adverse environmental impacts" of mining activities on federal forest lands. 36 C.F.R. § 228.1. The touchstone of the agency's discretionary determination is the likelihood that mining activities will cause significant disturbance of surface resources, which include fisheries and wildlife habitat. *Id.* §§ 228.4(a), 228.8(e); *see also Siskiyou*, 565 F.3d at 551 ("[T]his regulation . . . vests discretion in the district ranger to determine if the mining operation 'will likely

cause significant disturbance of surface resources.' "). Thus, the Forest Service can exercise its discretion to benefit a listed species by approving or disapproving NOIs based on whether the proposed mining activities satisfy particular habitat protection criteria. The agency can reject a NOI and require that the prospective miner instead submit a Plan of Operations, under which the Forest Service can impose additional habitat protection conditions. 36 C.F.R. §§ 228.4(e), 228.5(a)(3).

The record in this case reveals at least three ways in which the Forest Service exercised discretion when deciding whether, and under what conditions, to approve NOIs for mining activities in the Klamath and Six Rivers National Forests.

[17] First, the Forest Service exercised discretion by formulating criteria for the protection of coho salmon habitat. Those criteria governed the approval or denial of NOIs. As described in detail above, District Ranger Vandiver of the Happy Camp District prepared for the 2004 mining season by meeting with Forest Service biologists Bemis and Grunbaum. After consulting with them, Vandiver formulated criteria for protecting coho salmon habitat from the effects of suction dredge mining conducted pursuant to NOIs. He specified by name each of the tributaries to the Klamath River that provided cold water refugia that should be protected, he specified the maximum number of dredges per mile on the river and on its tributaries, and he required that tailings be raked back into dredge holes.

Once Vandiver had exercised his discretion to formulate these specific criteria, they became conditions with which any prospective miner submitting a NOI in the Happy Camp District had to comply. For example, Nida Johnson amended her NOI to refrain from dredging in a cold water refugia near the mouth of Independence Creek. But she made clear that she did so only because, absent compliance with the condition imposed by Vandiver, she would not be allowed to engage in

mining under a NOI. Similarly, a week after Vandiver had communicated the criteria to the New 49'ers, that group submitted an eight-page, single-spaced NOI for mining in the Happy Camp District that complied with the three criteria. Vandiver approved the NOI the next day. All four NOIs approved in the Happy Camp District complied with Vandiver's specified criteria.

[18] Second, the Forest Service exercised discretion by refusing to approve a detailed NOI submitted by the New 49'ers for mining activities in the Orleans District of the Six Rivers National Forest. Acting Forest Supervisor Metz refused to approve the NOI because, in his view, it provided insufficient protection of fisheries habitat: a cold water refugia at the mouth of a particular creek was not mentioned in the NOI, and there was insufficient mitigation of the dangers posed by loose tailings piles left by the dredges. The New 49'ers submitted a new NOI, but then withdrew it five days later. The New 49'ers' representative wrote that despite "substantial . . . dialog," the Forest Service's protective conditions meant that "there are too many sensitive issues for us to try and manage a group mining activity along the Salmon River at this time."

[19] Third, the Forest Service exercised discretion when it applied different criteria for the protection of fisheries habitat in different districts of the Klamath National Forest. District Ranger Vandiver developed and applied very specific protective criteria for granting or denying NOIs in the Happy Camp District. Different protective criteria for NOIs were developed and applied in the Scott River District. There is nothing in the record to tell us how the criteria were developed in the Scott River District. But it is clear that those criteria were different, at least in their application, from those in the Happy Camp District. The New 49'ers submitted a NOI to District Ranger Haupt in the Scott River District that complied in full with one of the criteria applied in the Happy Camp District by specifying the maximum number of dredges per mile. The

NOI complied, to some degree, with a second Happy Camp criterion by committing to work with the Forest Service to identify cold water refugia. But the NOI did not promise to observe any particular cold water refugia and did not promise to stay a specified distance from any creek mouth. Finally, the NOI did not comply at all with the third Happy Camp criterion, for it did not mention raking tailings piles back into dredge holes. Scott River District Ranger Haupt denied the NOI for reasons unrelated to these three criteria, and he did not include these criteria in the approved Plan of Operations. Discretion is defined as " 'the power or right to decide or act according to one's own judgment; freedom of judgment or choice.' " *Home Builders*, 551 U.S. at 668 (quoting Random House Dictionary of the English Language 411 (unabridged ed. 1967)). District Rangers Vandiver and Haupt each exercised their own judgment by formulating and applying different criteria when deciding whether to approve or deny NOIs in their districts. This is the very definition of discretion.

[20] Under our established case law, there is "agency action" sufficient to trigger the ESA consultation duty whenever an agency makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed. As to all four NOIs challenged in this appeal, the Forest Service made an affirmative, discretionary decision whether to allow private mining activities to proceed under specified habitat protection criteria. Accordingly, we hold that the Forest Service's approval of the NOIs constituted discretionary agency action within the meaning of Section 7 of the ESA.

2. May Affect Listed Species or Critical Habitat

[21] An agency has a duty to consult under Section 7 of the ESA for any discretionary agency action that "may affect" a listed species or designated critical habitat. *Turtle Island*, 340 F.3d at 974 (citing 50 C.F.R. § 402.14(a)). An agency may avoid the consultation requirement only if it determines

that its action will have "no effect" on a listed species or critical habitat. *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447-48 (9th Cir. 1996). Once an agency has determined that its action "may affect" a listed species or critical habitat, the agency must consult, either formally or informally, with the appropriate expert wildlife agency. If the wildlife agency determines during informal consultation that the proposed action is "not likely to adversely affect any listed species or critical habitat," formal consultation is not required and the process ends. 50 C.F.R. § 402.14(b)(1). Thus, actions that have any chance of affecting listed species or critical habitat — even if it is later determined that the actions are "not likely" to do so — require at least some consultation under the ESA.

We have previously explained that "may affect" is a "relatively low" threshold for triggering consultation. *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009). " '*Any possible effect*, whether beneficial, benign, adverse or of an undetermined character,' " triggers the requirement. *Id.* at 1018-19 (quoting 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)) (emphasis in *Lockyer*). The Secretaries of Commerce and the Interior have explained that "[t]he threshold for formal consultation must be set sufficiently low to allow Federal agencies to satisfy their duty to 'insure' " that their actions do not jeopardize listed species or adversely modify critical habitat. 51 Fed. Reg. at 19,949.

[22] Whether the mining activities approved by the Forest Service in this case "may affect" critical habitat of a listed species can almost be resolved as a textual matter. By definition, mining activities that require a NOI "might cause" disturbance of surface resources. 36 C.F.R. § 228.4(a). "Surface resources" include underwater fisheries habitat. *Id.* at § 228.8(e); 70 Fed. Reg. at 32,718 ("Fisheries habitat, of course, can consist of nothing other than water, streambeds, or other submerged lands."). The Forest Service approved NOIs to conduct mining activities in and along the Klamath

River system, which is designated critical habitat for listed coho salmon. 64 Fed. Reg. at 24,049. If the phrase "might cause" disturbance of fisheries habitat is given an ordinary meaning, it follows almost automatically that mining pursuant to the approved NOIs "may affect" critical habitat of the coho salmon. Indeed, the Forest Service does not dispute that the mining activities in the Klamath River system "may affect" the listed coho salmon and its critical habitat.

The Miners, however, contend that the record is "devoid of any evidence" that the mining activities may affect coho salmon. The Miners make two arguments in support of their contention. Neither argument withstands scrutiny.

First, the Miners argue that there is no evidence "that even a single member of any listed species would be 'taken' by reason" of the mining activities approved in the NOIs. "Take" has a particular definition under the ESA. 16 U.S.C. § 1532(19) ("The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."); *see also* 50 C.F.R. § 17.3 (further defining "harm" and "harass"). Whether mining activities effectuate a "taking" under Section 9 of the ESA is a distinct inquiry from whether they "may affect" a species or its critical habitat under Section 7. *See Sweet Home Chapter*, 515 U.S. at 703 ("Section 7 imposes a broad, affirmative duty to avoid adverse habitat modifications that § 9 does not replicate . . . ."). The Miners also fault the Tribe for failing to identify "so much as a single endangered fish or fish egg ever injured by this [mining] activity." But where, as here, a plaintiff alleges a procedural violation under Section 7 of the ESA, as opposed to a substantive violation under Section 9, the plaintiff need not prove that a listed species has in fact been injured. *See Thomas v. Peterson*, 753 F.2d 754, 765 (9th Cir. 1985) ("It is not the responsibility of the plaintiffs to prove, nor the function of the courts to judge, the effect of a proposed action on an endangered species when proper procedures have not been followed."). The plaintiff need only

show, as the Tribe has done here, that the challenged action "may affect" a listed species or its critical habitat.

Second, the Miners argue that Vandiver's consultation with Forest Service biologists, and the resulting habitat protection criteria, "assured" that there would be "no impact whatsoever on listed species." This argument cuts against, rather than in favor of, the Miners. The fact that District Ranger Vandiver formulated criteria to mitigate effects of suction dredging on coho salmon habitat does not mean that the "may affect" standard was not met. Indeed, that Vandiver consulted with Forest Service biologists in an attempt to reduce a possible adverse impact on coho salmon and their habitat suggests exactly the opposite. After Vandiver approved a NOI to conduct mining activities in and along the Klamath River for the 2004 mining season, Forest Service biologist Bemis sent a "Note to the File" stating that the miners' compliance with Vandiver's specified criteria should "reduce" — not eliminate — "the impacts to anadromous fisheries on the Happy Camp Ranger District." The agency has never suggested that the approved mining activities would have "no effect" on coho salmon or their critical habitat. *See Sw. Ctr. for Biological Diversity*, 100 F.3d at 1447.

Moreover, the record in this appeal includes ample evidence that the mining activities approved under the NOIs in the Happy Camp District "may affect" coho salmon and their critical habitat. Coho salmon in the Klamath River system were listed as threatened in 1997, and the river and adjacent riparian zones were designated as critical habitat two years later. In listing the coho salmon, the Fisheries Service noted that the salmon population was "very depressed." 62 Fed. Reg. at 24,588. The Fisheries Service concluded that "human-induced impacts," such as over-harvesting, hatchery practices, and habitat modification including mining, had played a significant role in the decline and had "reduced the coho salmon populations' resiliency" in the face of natural challenges. *Id.* at 24,591. The Fisheries Service also concluded that "existing

regulatory mechanisms are either inadequate or not implemented well enough to conserve" the salmon. *Id.* at 24,588.

The record also includes information about the effects of suction dredge mining that Forest Service biologist Grunbaum provided at an April 2004 meeting. Grunbaum wrote that relatively few studies of suction dredging had been performed, but "the majority . . . showed that suction dredging can adversely affect aquatic habitats and biota." The effects varied across ecosystems; in some, "dredging may harm the population viability of threatened species." Grunbaum summarized specific potential adverse effects. First, "[e]ntrainment by suction dredge can directly kill and indirectly increase mortality of fish — particularly un-eyed salmonid eggs and early developmental stages." Second, disturbance from suction dredging can kill the small invertebrates that larger fish feed on, or alter the invertebrates' environment so that they become scarce. Third, destabilized streambeds can "induc[e] fish to spawn on unstable material," and fish eggs and larvae can be "smothered or buried." Fourth, because the streams the salmon occupy are already at "near lethal temperatures," even "minor" disturbances in the summer can harm the salmon. Fifth, juvenile salmon could be "displaced to a less optimal location where overall fitness and survival odds are also less." Finally, a long list of other factors — disturbance, turbidity, pollution, decrease in food base, and loss of cover associated with suction dredging — could combine to harm the salmon.

**[23]** We conclude that the mining activities approved by the Forest Service in this case "may affect" the listed coho salmon and its critical habitat. Indeed, as a textual matter, mining activities in designated critical habitat that require approval under a NOI likely satisfy the low threshold triggering the duty to consult under the ESA. *See* 64 Fed. Reg. at 24,050 ("designation of critical habitat provides Federal agencies with a clear indication as to when consultation under section 7 of the ESA is required").

### 3.   Burden on the Forest Service

The burden imposed by the consultation requirement need not be great. Consultation under the ESA may be formal or informal. 50 C.F.R. §§ 402.13, 402.14. Formal consultation requires preparation of a biological opinion detailing how the agency action affects listed species or their critical habitat, but informal consultation need be nothing more than discussions and correspondence with the appropriate wildlife agency. *Id.* § 402.02. If the wildlife agency agrees during informal consultation that the agency action "is not likely to adversely affect listed species or critical habitat," formal consultation is not required and the process ends. *Id.* § 402.13(a). Thus, whereas approval of a Plan of Operations — for mining activities that "will likely cause significant disturbance of surface resources" — may often require formal consultation and preparation of a biological opinion, informal consultation may often suffice for approval of a NOI.

In fact, District Ranger Vandiver voluntarily initiated a type of informal consultation in this case. He consulted with Forest Service biologists Bemis and Grunbaum in formulating detailed protective criteria that would avoid the likelihood of significant habitat disturbance caused by suction dredge mining in the Happy Camp District. The problem is that Vandiver consulted with employees of the Forest Service, rather than the Fish and Wildlife Service or NOAA Fisheries Service. Congress made a conscious decision in the ESA to require that federal agencies consult with the expert wildlife agencies, not merely with biologists within their own agencies, about the adverse effects that their actions might have on listed species. If Vandiver had consulted with employees of the federal wildlife agencies, and those agencies agreed that the specified protective criteria would avoid the likelihood of adverse effects on coho salmon habitat, that consultation would have sufficed under the ESA. *See* 50 C.F.R. § 402.13. Any NOIs approved under such protective criteria likely would have required no further consultation. *Cf. Tex. Indep. Producers &*

*Royalty Owners Ass'n v. Envtl. Prot. Agency*, 410 F.3d 964, 979 (7th Cir. 2005) (because EPA informally consulted before issuing a "general permit" authorizing private operators to discharge stormwater according to specified criteria, the agency had no duty to consult when operators submitted individual NOIs indicating their compliance with the general permit).

## Conclusion

**[24]** There is "agency action" under Section 7 of the ESA whenever an agency makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed. In approving the NOIs challenged in this case, the Forest Service made affirmative, discretionary decisions to authorize mining activities under specified protective criteria. By definition, mining activities requiring a NOI are those that "might cause" disturbance of surface resources, including underwater fisheries habitat. The Forest Service does not dispute that the mining activities it approved in this case "may affect" critical habitat of coho salmon in the Klamath River system. The Forest Service therefore had a duty under Section 7 of the ESA to consult with the relevant wildlife agencies before approving the NOIs.

**[25]** We reverse the district court's denial of summary judgment on the Karuk Tribe's ESA claim and remand for entry of judgment in favor of the Tribe.

**REVERSED** and **REMANDED.**

M.   SMITH, Circuit Judge, with whom KOZINSKI, Chief Judge, joins, and with whom IKUTA and MURGUIA, Circuit Judges, join as to Parts I through VI, dissenting:



*I attempted to rise, but was not able to stir: for, as I happened to lie on my back, I found my arms and legs were strongly fastened on each side to the ground; and my hair, which was long and thick, tied down in the same manner. I likewise felt several slender ligatures across my body, from my arm-pits to my thighs. I could only look upwards; the sun began to grow hot, and the light offended my eyes.*

—Jonathan Swift, GULLIVER'S TRAVELS, Chapter 1.

Here we go again.

Until today, it was well-established that a regulatory agency's " 'inaction' is not 'action' " that triggers the Endangered Species Act's (ESA) arduous interagency consultation process. *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1108 (9th Cir. 2006). Yet the majority now flouts this crystal-clear and common sense precedent, and for the first time holds that an agency's decision *not to act* forces it into a bureaucratic morass.

In my view, decisions such as this one, and some other environmental cases recently handed down by our court (*see* Part VII, *infra*), undermine the rule of law, and make poor Gulliver's situation seem fortunate when compared to the plight of those entangled in the ligatures of new rules created out of thin air by such decisions.

## I. Mining in national forests

The right to mine on national lands is established by the Mining Act of 1872, 30 U.S.C. § 21 *et seq.*:

> 'Under the provisions of the Mining Act, an individual may enter and explore land in the public domain in search of valuable mineral deposits. After minerals are discovered, the claimant may file a "mining claim" with the Bureau of Land Management (BLM), which if approved, entitles the claimant to the right of exclusive possession of that claim, as long as the requirements of the Mining Act are met. Although ownership of a mining claim does not confer fee title to the claimant, the claimant does have the right to extract all minerals from the claim without paying royalties to the United States.

*Swanson v. Babbitt*, 3 F.3d 1348, 1350 (9th Cir. 1993).

The Mining Act's permissive regime extends to national forests as well. The 1897 act that created the national forests and provided rules governing those forests' use, *see* Organic Administration Act, 16 U.S.C. §§ 473-78, emphasized that its provisions do not "prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof. Such persons must comply with the rules and regulations covering such national forests." 16 U.S.C.§ 478.

When the U.S. Forest Service issued the mining regulations at issue in this case, the Service emphasized "that prospectors and miners have *a statutory right, not mere privilege*, under the 1872 mining law and the Act of June 4, 1897, to go upon and use the open public domain lands of the National Forest System for the purposes of mineral exploration, development and production." National Forests Surface Use Under U.S. Mining Laws, 39 Fed. Reg. 31,317, at 31,317 (Aug. 28, 1974) (emphasis added).

## II.    The regulatory scheme

This case turns on whether a Forest Service District Ranger's receipt of, consideration of, and response to a miner's notice of intention to operate—a Notice of Intent—is an *agency action* that authorizes mining activities on national forests. This distinction is critical because the ESA requires federal agencies to consult with the Fish and Wildlife Service or NOAA Fisheries Service before taking "any action authorized, funded, or carried out by such agency" that might harm a listed species. 16 U.S.C. § 1536(a)(2).

The ESA's implementing regulations (promulgated by the Secretaries of Commerce and the Interior) offer a list of examples of agency action, including (in relevant part) "the

granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid." 50 C.F.R. § 402.02 (2004).

In this appeal, Plaintiff-Appellant asserts a single claim challenging the District Ranger's failure to consult with the Fish and Wildlife Service or NOAA Fisheries Service when deciding to allow certain suction dredge mining to proceed under a Notice of Intent rather than a Plan of Operations. The dispute here is narrow: specifically, does the Forest lK Service's handling of Notices of Intent constitute an "authorization" of private mining activity under the ESA?

To answer this question, one must have a clear understanding of the operative regulations. In recognition of the "statutory right, not mere privilege" to mine in national forests, the Forest Service has carefully tailored its regulations to balance environmental goals with miners' unique pre-existing rights of access to national forests. *See* National Forests Surface Use, 39 Fed. Reg. 31,317 (Aug. 28, 1974). These regulations apply *only* to mining activities on Forest Service lands. 36 C.F.R. § 228.2 (2004).[1]

All mining "operations" must "be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources." *Id.* § 228.8(e); *see also id.* § 228.3(a) (defining "operations" broadly for purposes of these regulations). This environmental-impact provision requires compliance with federal air and water quality standards, as well as (among other things) the use of "all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations." *Id.* § 228.8. Forest Service officials must "periodically inspect operations to determine if the operator is complying with the[se] regulations," and inform non-compliant miners how to bring their activities into compliance. *Id.* § 228.7.

---

[1]Because the challenged Notice of Intent decisions were made in 2004, I rely upon the 2004 version of the regulation.

In addition to these generally applicable limitations on mining in the national forests, the Forest Service imposes additional requirements depending on the mining activities' potential environmental impact. For purposes of these additional requirements, mining activities are divided into three categories: activities that "will not," "might," and "will likely" lead to "significant disturbance of surface resources." *Id.* § 228.4(a), (a)(1)(v).

For activities that "will not" significantly disturb surface resources—including "occasionally remov[ing] small mineral samples or specimens," and "remov[ing] . . . a reasonable amount of mineral deposit for analysis and study"—persons may freely enter the national forest to conduct those activities. *Id.* § 228.4(a)(1), (a)(2)(ii), (a)(2)(iii).

For more substantial mining activities that "might" or "will likely" cause resource disturbance, miners must file a "notice of intention to operate"—a Notice of Intent, which is the focus of this appeal. *Id.* § 228.4(a).[2] The Notice of Intent is a straightforward document, requiring miners to list: (1) the name, address, and telephone number of the operator; (2) the area involved; (3) the nature of the proposed operations; (4) the route of access to the area; and (5) the method of transport to be used. U.S. Forest Serv., *Notice of Intent Instructions: 36 CFR 228.4(a) - Locatable Minerals*, http://www.fs.usda.gov/ Internet/FSE_DOCUMENTS/fsm9_020952.pdf (last visited May 4, 2012); *see also* 36 C.F.R. § 228.4(a)(2)(iii) (2004).

Once "a notice of intent is filed, the District Ranger will, within 15 days of receipt thereof, notify the operator whether a plan of operations is required." 36 C.F.R. § 228.4(a)(2)(iii) (2004). A Plan of Operations is required if the proposed mining activities "will likely" cause significant surface resource

---

[2]For purposes of this dissent, it is unnecessary to resolve whether suction dredge mining "may affect" Coho salmon. My primary disagreement with the majority stems from its finding of an agency "action."

disturbance. *Id.* § 228.4(a). In contrast, if "significant disturbance is *not* likely," then a Plan of Operations "is *not required*." *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 557 (9th Cir. 2009) (emphasis in original). "[M]ining activity that *might* cause disturbance of surface resources, yet [is] not *likely to do so* . . . require[s] only a notice of intent under 36 C.F.R. § 228.4(a)." *Id.* (emphasis in original).

If the District Ranger requests a Plan of Operations, the Plan must contain "[i]nformation sufficient to describe or identify the type of operations proposed and how they would be conducted, the type and standard of existing and proposed roads or access routes, the means of transportation used . . . , the period during which the proposed activity will take place, and measures to be taken to meet the requirements for environmental protection in § 228.8." 36 C.F.R. § 228.4(c)(3) (2004). The District Ranger must "complet[e] . . . an environmental analysis in connection with each proposed operating plan," *id.* § 228.4(f), and within thirty days of submission (or ninety days if necessary), either "approve[ ] the plan" or "[n]otify the operator of any changes in, or additions to, the plan of operations deemed necessary to meet the purpose of the regulations in this part." *Id.* § 228.5(a)(1), (3).[3]

## III.   Forest Service's interpretation of its regulations

The majority asserts that the Forest Service's *decision* not to require a Plan of Action for the mining activities described in a Notice of Intent constitutes an *implicit authorization* of those mining activities, therefore equating the Forest Service's "decision" with an agency "authorization" under the ESA.

---

[3]In some cases, the District Ranger will inform the miner that a Plan of Operations is unnecessary, *id.* § 228.5(a)(2), or require the filing of an environmental statement with the Council on Environmental Quality, *id.* § 228.5(a)(5).

The Forest Service never contemplated such a result. The Forest Service's explanation of its mining regulations establishes that a Notice of Intent is used as an information-gathering tool, not an application for a mining permit. Consistent with the Forest Service's interpretations, the Ranger's response to a Notice of Intent is analogous to the Notice of Intent itself, and provides merely notice of the agency's review decision. It is not a permit, and does not impose regulations on private conduct as does a Plan of Operations. The Forest Service interprets the Notice of Intent as an information-gathering tool used to decide whether a miner should file a Plan of Operations:

> "[T]he requirement for prior submission of a notice of intent to operate *alerts* the Forest Service that an operator proposes to conduct mining operations on [National Forest Service] lands which the operator believes might, but are not likely to, cause significant disturbance of [National Forest Service] surface resources and *gives the Forest Service the opportunity to determine* whether the agency agrees with that assessment such *that the Forest Service will not exercise its discretion to regulate those operations*.

Clarification as to When a Notice of Intent To Operate and/or Plan of Operation Is Needed for Locatable Mineral Operations on National Forest System Lands, 70 Fed. Reg. 32,713, at 32,720 (June 6, 2005) (emphasis added).[4]

The Forest Service adds that the Notice of Intent process was designed to be "a *simple notification procedure*" that would

---

[4]I rely on the Forest Service's 2005 clarification of its mining rules because this document contains the clearest and most thorough explanation of the history and application of these regulations. The 2005 clarification did not materially change the operative provisions. 70 Fed. Reg. at 32,727-28.

"assist prospectors in determining whether their operations would or would not require the filing of an operating plan. Needless uncertainties and expense in time and money in filing unnecessary operating plans could be avoided thereby . . . . [The 1974 notice-and-comment rulemaking] record makes it clear that *a notice of intent to operate was not intended to be a regulatory instrument; it simply was meant to be a notice* given to the Forest Service by an operator which describes the operator's plan to conduct operations on [National Forest Service] lands. Further, this record demonstrates that the intended trigger for a notice of intent to operate is reasonable uncertainty on the part of the operator as to the significance of the potential effects of the proposed operations. In such a circumstance, *the early alert provided by a notice of intent to operate* would advance the interests of both the Forest Service and the operator by *facilitating resolution of the question*, "Is submission and approval of a plan of operations required before the operator can commence proposed operations?"

*Id.* at 32,728 (emphasis added).

Under the Forest Service's regulations, a Notice of Intent is exactly what its name implies: a *notice* from the miner, not a *permit* or *license* issued by the agency. It is merely a precautionary agency notification procedure, which is at most a preliminary step prior to agency action being taken.

## IV.   Precedent distinguishing "action" from "inaction"

Our precedent establishes that there is a significant difference between a *decision not to act* and an *affirmative authorization*. These cases distinguish between "agency action" and "agency inaction," and illustrate the meaning of the operative regulation's reference to "licenses," "permits," and the like.

50 C.F.R. § 402.02 (2004). In the pertinent cases involving "agency action," the agency takes an *affirmative step* that allows private conduct to take place; without the agency's affirmative action (such as issuing a permit, license, or contract), the private conduct could not occur.[5] In the pertinent cases involving agency *inaction*, private conduct may take place until the agency takes affirmative steps to intervene. The relevant case law requires us to identify the default position: if the agency does nothing, can the private activity take place? If the activity can proceed regardless of whether the agency takes any actions, then the activity does not involve the agency's "granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid" as required for "agency action" under the regulations. *Id.*

*Western Watersheds Project* involved the BLM's regulation (or, more accurately, non-regulation) of private parties' diversions of water that were done pursuant to those parties' pre-existing rights-of-way. 468 F.3d at 1103. Similar to this case, nineteenth-century federal laws recognized those rights-of-way, *id.* at 1103-04, but the BLM retained the power to regulate diversions that were more than " 'substantial deviation[s]' " from prior uses, *id.* at 1109 (quoting 43 C.F.R. § 2803.2(b) (2004) (promulgated in 1986)). We assumed that the BLM had the power to regulate the diversions in dispute, and held that the BLM's failure to exercise this power was not an "agency action" triggering ESA consultation obligations. *Id.* at 1108-09. We explained that agency " 'inaction' is not 'action' for section 7(a)(2) purposes." *Id.* at 1108. "[T]he BLM did not *fund* the diversions, it did not *issue* permits, it did not *grant* contracts, it did not *build* dams, nor did it *divert*

---

[5]For example, *Turtle Island Restoration Network v. National Marine Fisheries Service*, 340 F.3d 969 (9th Cir. 2003), involved an agency's issuance of permits to fishing vessels. The operative statutory regime "*require[d]* United States vessels to obtain permits to engage in fishing operations on the high seas . . . ." *Id.* at 973 (emphasis added). In other words, absent an agency permit, the vessels could not undertake their fishing operations.

streams." *Id.* at 1109 (emphasis in original). Rather, the BLM made a decision not to regulate, which was not "agency action" under the ESA. We explained that "the duty to consult is triggered by affirmative actions." *Id.* at 1102; *see also Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1070 (9th Cir. 1996) ("Protection of endangered species would not be enhanced by a rule which would require a federal agency to perform the burdensome procedural tasks mandated by section 7 simply because it advised or consulted with a private party."); *Cal. Sportfishing Protection Alliance v. FERC*, 472 F.3d 593, 595, 598 (9th Cir. 2006) (holding that "the agency[ ] ha[d] proposed no affirmative act that would trigger the consultation requirement" for operations of a hydroelectric plant that were authorized by an earlier and ongoing permit, even though the agency was empowered to "unilaterally institute proceedings to amend the license if it so chose"). Predictably, the majority relegates discussion of this precedent to a brief citation and entirely fails to distinguish it from this case. Moreover, the majority does not point to a *single* opinion in which any court has held that such inaction triggers the ESA's consultation requirements.

Granted, *Western Watersheds Project* addressed both prongs of the ESA's "agency action" requirement: first, whether there is agency action as defined in 50 C.F.R. § 402.02, and second, whether that agency action is "discretionary," 50 C.F.R. § 402.03. Here, I address only the "action" requirement, because the agency has discretion when deciding whether or not to act. But the regulations and case law show that these two requirements—action and discretion—are conjunctive, not disjunctive. If the agency has discretion to act but decides not to act, then there is no agency action under the ESA.

An almost identical regulatory scheme was at issue in *Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1988). Under 43 C.F.R. § 3809 (1986), the BLM uses a three-tiered approach to regulating placer mining on federal lands within

its jurisdiction. First are "casual" use mines, for which no notice or approval is required. 857 F.2d at 1309. Second are "notice" mines, for which no BLM approval is required but for which the miner must submit basic information to the BLM about the proposed operations at least fifteen days prior to commencing them. *Id.* BLM monitors "casual" and "notice" mining operations for compliance. *Id.* at 1310. Third are "plan" mines, which must be approved by the BLM and subjected to environmental assessment before the operation may proceed. *Id.* at 1309.

The BLM's approach to "casual," "notice," and "plan" mining operations follows the same structure as the Forest Service's approach to mining activities that "are not likely to," "might," and "are likely to" cause significant surface resource disturbance. *See* 36 C.F.R. § 228.4. This similarity was intentional. 45 Fed. Reg. 78,906 (Nov. 26, 1980) (explaining that the regulations were designed "to be as consistent as possible with the Forest Service regulations").

At issue in *Penfold* was whether the BLM's approval of Notice mines is a "major Federal action." Such a finding would trigger the National Environmental Policy Act's (NEPA) requirement that the BLM file an environmental impact statement. We held that the approval was not a major Federal action. 857 F.2d at 1314. *Penfold* can be read to say that the BLM's review of a notice is a "marginal" agency action, just not a "major" one. *See id.* at 1313-14. But just as actions must be "major" to trigger NEPA obligations, actions carried out entirely by private parties must involve "affirmative" federal agency authorization to trigger section 7's consultation requirement. The mere fact that the agency is involved in some way is not enough. Thus, even assuming the Tribe is correct that the threshold for triggering environmental compliance under the ESA is lower than for NEPA, I nonetheless find our previous determination that a similar notice scheme was not the sort of agency action that requires envi-

ronmental compliance to be additional persuasive authority in support of the district court's holding.

I emphasize the narrowness of the question before us; I do not argue that every Forest Service "decision" is exempted from ESA consultation. The Forest Service's mining regulations are clearly distinguishable from the Forest Service's other regulatory activities. For example, the Forest Service must consult under the ESA when it creates and implements Land and Resource Management Plans, which govern "every individual project" in each national forest. *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir. 1994). In addition, the Forest Service's negotiation and execution of timber-sale contracts, 16 U.S.C. § 472a(a); 36 C.F.R. § 223.1 (2011), is undoubtedly an agency "authoriz[ation]" that requires ESA consultation. *See* 50 C.F.R. § 402.02 (2004) (agency actions include "granting of . . . contracts"); *see also Nw. Forest Res. Council v. Pilchuck Audubon Soc'y*, 97 F.3d 1161, 1167 (9th Cir. 1996) (noting that Forest Service consulted with Fish and Wildlife Service regarding timber sales' effect on marbled murrelets). The same is true for the Forest Service's construction of roads in the national forest. *Thomas v. Peterson*, 753 F.2d 754, 763-64 (9th Cir. 1985). Likewise, "all grazing and livestock use on National Forest System lands and on other lands under Forest Service control must be authorized by a grazing or livestock use permit." 36 C.F.R. § 222.3 (2011). The Forest Service's grant and oversight of such permits is undeniably "agency action" subject to the ESA consultation requirement. *See Forest Guardians v. Johanns*, 450 F.3d 455, 457-58, 463 (9th Cir. 2006).

But here, Notices of Intent are not permits, contracts, or plans issued by the Forest Service. They are mere *notifications* about miners' activities. Certainly, the Forest Service retains discretion to require miners to submit a Plan of Operations under appropriate circumstances. That was the conclusion reached in a recent Administrative Procedures Act decision, *Siskiyou Regional Education Project v. U.S. Forest*

*Service*: "determining which operations are likely to cause significant disturbance of surface resources—and therefore require a plan of operations—requires a discretionary determination by a district ranger." 565 F.3d at 557 (emphasis omitted). But the Forest Service's decision not to require a Plan of Operations is simply not an "authorization" as defined by the statute and regulations. The majority's proposed new category of agency conduct—*implicit agency action*—finds little support in the statutes, regulations, and case law.

The district court's opinion in this case follows naturally from *Western Watersheds Project*. Although the majority characterizes the Forest Service's response to a Notice of Intent as an "approval," an "authorization," and a "rejection," the relevant regulations show that the Forest Service is not approving, authorizing, or rejecting anything. It is receiving and analyzing information, and deciding not to take further action.

## V.   Subjective views of the parties

The majority relies heavily on the fact that the District Ranger and the miners *in this case* understood the Notice of Intent to be an "authorization."

At first glance, this case-specific reasoning may be enticing: after all, the miners sought the Ranger's "approv[al]" and the Ranger "authoriz[ed]" their activities. But this path of reasoning is full of legal obstacles, any one of which should be dispositive of the ultimate legal question under the ESA.

First, a similar argument was considered and rejected in *Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995), where we held that the BLM's letter purporting to "approv[e]" a construction project could not "be construed as an authorization within the meaning of [ESA] section 7(a)(2)" because the BLM's letter did not otherwise satisfy the statutory criteria of an ESA authorization. *Id.* at 1511.

Second, we are not bound by litigants' concessions of law (even assuming that the miners' and Ranger's letters can be deemed "concessions"). *E.g.*, *United States v. Ogles*, 440 F.3d 1095, 1099 (9th Cir. 2006) (en banc).

Third, the District Ranger has no authority to interpret the ESA or its implementing regulations, so his use of the term "authorization" cannot reasonably be read as an interpretation of the ESA regulations, 50 C.F.R. §§ 402.02-03 (2004).[6] *See generally Robertson*, 490 U.S. at 359 (discussing deference owed to agency's interpretation of its regulations); *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-45 (1984).

Fourth—*as even the Plaintiffs-Appellants recognize*—the question of whether an agency's course of conduct constitutes an "agency action" under the ESA is a legal question, not a factual one. *Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 11 (D.D.C. 2005).

Finally, to understand why the parties' conduct in this case cannot control our application of the ESA and its regulations, consider the implications of such a holding. A single District Ranger would be subjected to the ESA consultation process because he used the word "authorize" when responding to a Notice of Intent. However, no other District Ranger in the country would be subjected to the ESA under similar circumstances, even though those District Rangers operate under the same Forest Service regulations governing Notices of Intent. It goes without saying that this result makes little, if any,

---

[6]Regulatory authority under the ESA is delegated to the Departments of Interior and Commerce, *see Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 651, 664-65 (2007), whereas the Forest Service is a part of the Department of Agriculture, *see* U.S. Forest Service, "U.S. Forest Service History: Agency Organization," http://www.foresthistory.org/ASPNET/Policy/Agency_Organization/index.aspx (last visited May 4, 2012).

sense as an application of our national environmental protec-
tion laws.

## VI.    Discussions between miners and district rangers

The majority also relies on the fact that informal discus-
sions take place between miners and district rangers regarding
how the miners can modify their proposed activities to avoid
triggering the obligation to prepare a Plan of Operations. For
instance, a ranger may advise miners how to change their
plans in a way that will avoid causing significant surface
resource disturbances. If the miners do so, and describe their
appropriately modified activities in Notices of Intent, the reg-
ulations do not require anything further; the miners are autho-
rized to proceed with their mining activities under the General
Mining Law.

The majority mistakenly attempts to characterize such
informal discussions as the Forest Service's exercise of dis-
cretion to approve or deny an NOI. But we have long held
that these sorts of informal, voluntary discussions do not con-
stitute an agency action. *Marbled Murrelet v. Babbitt*, 83 F.3d
1068 (9th Cir. 1996). *Marbled Murrelet* is directly on point.
In that case, we held that a joint letter from U.S. Forest Ser-
vice and the California Department of Fish and Game to a
timber company describing "specific conditions that must be
followed to . . . avoid 'take' of the identified species under the
ESA" was "merely provid[ing] advice" that did not trigger
section 7 consultation under the ESA. *Id.* at 1074. As we
explained, "[p]rotection of endangered species would not be
enhanced by a rule which would require a federal agency to
perform the burdensome procedural tasks mandated by sec-
tion 7 simply because it advised or consulted with a private
party. Such a rule would be a disincentive for the agency to
give such advice or consultation." *Id.*

The majority takes exactly that step here. In holding that a
miner's submission of an NOI triggers section 7 consultation

under the ESA, the majority discourages miners from discussing their proposed activities with the Forest Service to voluntarily reduce their impact on the environment, and rather encourages miners to make their own determination that their activities are not likely to "cause significant disturbance of surface resources," 36 C.F.R. § 228.4(a), and thus no NOI need be filed.

## VII.   Brave New World

*Abandon all hope, ye who enter here.*

— Dante Alighieri, THE DIVINE COMEDY, Inferno Canto III

I cannot conclude my dissent without considering the impact of the majority's decision in this case, and others like it, which, in my view, flout our precedents and undermine the rule of law. In doing so, I intend no personal disrespect or offense to any of my colleagues. My intent is solely to illuminate the downside of our actions in such environmental cases.

By rendering the Forest Service impotent to meaningfully address low impact mining, the majority effectively shuts down the entire suction dredge mining industry in the states within our jurisdiction. The informal Notice of Intent process allows projects to proceed within a few weeks. In contrast, ESA interagency consultation requires a formal biological assessment and conferences, and can delay projects for months or years. Although the ESA generally requires agencies to complete consultations within ninety days, 16 U.S.C. § 1536(b), the agencies frequently miss their deadlines due to personnel shortages. One study found that nearly 40 percent of U.S. Fish and Wildlife Service ESA consultations were untimely, with some taking two or three years. Government Accountability Office, *More Federal Management Attention is Needed to Improve the Consultation Process*, March 2004. Moreover, formal consultation comes at great costs to the private applicants, often requiring them to hire outside experts

because the agency is backlogged. *Id.* Most miners affected by this decision will have neither the resources nor the patience to pursue a consultation with the EPA; they will simply give up, and curse the Ninth Circuit.

As a result, a number of people will lose their jobs and the businesses that have invested in the equipment used in the relevant mining activities will lose much of their value. In 2008, California issued about 3,500 permits for such mining, and 18 percent of those miners received "a significant portion of income" from the dredging. *See* Justin Scheck, *California Sifts Gold Claims*, The Wall Street Journal, April 29, 2012. The gold mining operation in this case, the New 49ers, organizes recreational weekend gold-mining excursions. The majority's opinion effectively forces these people to await the lengthy and costly ESA consultation process if they wish to pursue their mining activities, or simply ignore the process, at their peril.

Unfortunately, this is not the first time our court has broken from decades of precedent and created burdensome, entangling environmental regulations out of the vapors. In one of the most extreme recent examples, our court held that timber companies must obtain Environmental Protection Agency permits for stormwater runoff that flows from primary logging roads into systems of ditches, culverts, and channels. *Nw. Envtl. Def. Ctr. v. Brown*, 640 F.3d 1063 (9th Cir. 2011). In the nearly four decades since the Clean Water Act was enacted, no court or government agency had ever imposed such a requirement. Indeed, the EPA promulgated regulations that explicitly exempted logging from this arduous permitting requirement. *Id.* at 1073. Yet our court decided to disregard the regulation and require the permits.

The result? The imminent decimation of what remains of the Northwest timber industry. The American Loggers Council estimates that the decision, if implemented, will result in up to three million more permit applications nationwide. The

timber industry is not the only group criticizing *Brown*. Three of Oregon's leading politicians quickly attacked the ruling. Oregon U.S. Senator Ron Wyden predicted that this opinion "would shut down forestry on private, state and tribal lands by subjecting it to the same, endless cycle of litigation." Oregon Congressman Kurt Schrader called the opinion a "bad decision" that would create "another layer of unnecessary bureaucracy." Oregon Governor John Kitzhaber branded the opinion as "legally flawed."

Oregon political leaders have good reason to be concerned about the impact of our rulings on logging. Decades of court injunctions already have battered the state's timber industry, once a dominant employer that paid excellent wages. In the 1970s and 1980s, the wood product industry employed more than 70,000 Oregonians and paid 30 percent more than the state average wage. Now, the industry employs 25,000 people and pays the state average wage. Josh Lehner, *Historical Look at Oregon's Wood Product Industry*, Oregon Office of Economic Analysis, Jan. 23, 2012, *available at* http://oregoneconomicanalysis.wordpress.com/2012/01/23/historical-look-at-oregons-wood-product-industry/ (last visited May 4, 2012). Requiring millions of burdensome new permits will only accelerate the decline.

*Brown* also profoundly harms rural local governments. Because counties receive twenty-five percent of the revenues from timber harvests on federal land, the decrease in logging has caused shorter school days, smaller police forces, and closures of public libraries. Moreover, *Brown* subjects rural counties to the burdensome permitting requirement if their roads are used for logging. The Association of Oregon Counties estimates that the decision will increase planning costs to Oregon counties by $56 million.

More recently, a panel majority of our court handed down *Pacific Rivers Council v. United States Forest Service*, 668 F.3d 609 (9th Cir. 2012). The Forest Service spent years

developing a forest management plan for 11.5 million acres of national forest land in the Sierra Nevada. We overturned that plan, holding that the Forest Service's programmatic environmental impact statement must "analyze environmental consequences of a proposed plan as soon as it is 'reasonably possible' to do so." *Id.* at 623. This conflicts with our long-standing rule that "NEPA requires a full evaluation of site-specific impacts *only* when a 'critical decision' has been made to act on site development—*i.e.*, when 'the agency proposes to make an irreversible and irretrievable commitment of the availability of resources to [a] project at a particular site.' " *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 801 (9th Cir. 2003) (quoting *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)). *Pacific Rivers Council's* de facto reversal of well-established precedent will dramatically impede any future logging in the West. Because environmental agencies will never be certain whether the unclear "reasonably possible" standard applies, it will take even longer for the agencies to approve forest plans.

Farmers, too, have suffered, and will continue to suffer, from the impact of similarly extreme environmental decisions. The Central Valley Project Improvement Act, Pub. L. No. 102-575, 106 Stat. 4600 (1992), requires that 800,000 acre feet of water in California's Central Valley Project be designated for "the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures[.]" In *San Luis & Delta-Mendota Water Authority v. United States*, 672 F.3d 676 (9th Cir. 2012), the majority inexplicably read this requirement to mean that water counts toward that yield only if it "predominantly contributes to one of the primary purpose programs." *Id.* at 697. This interpretation has absolutely no basis in the statutory text. The practical impact of this decision is that there will be less, perhaps far less, water for irrigation in the San Joaquin Valley's $20 billion crop industry. *Id.* at 715-16 (M. Smith, J., dissenting). The region's farms and communities, and the thousands of people employed there, already have suffered because of the lack of

water, with approximately 250,000 acres of farmland now lying fallow, and unemployment ranging between 20 percent and 40 percent. *Id.*

No legislature or regulatory agency would enact sweeping rules that create such economic chaos, shutter entire industries, and cause thousands of people to lose their jobs. That is because the legislative and executive branches are directly accountable to the people through elections, and its members know they would be removed swiftly from office were they to enact such rules. In contrast, in order to preserve the vitally important principle of judicial independence, we are not politically accountable. However, because of our lack of public accountability, our job is constitutionally confined to *interpreting* laws, not *creating* them out of whole cloth. Unfortunately, I believe the record is clear that our court has strayed with lamentable frequency from its constitutionally limited role (as illustrated *supra*) when it comes to construing environmental law. When we do so, I fear that we undermine public support for the independence of the judiciary, and cause many to despair of the promise of the rule of law.[7]

I respectfully dissent.

---

[7]"[R]epeated and essentially head-on confrontations between the life-tenured branch and the representative branches of government will not, in the long run, be beneficial to either. The public confidence essential to the former and the vitality critical to the latter may well erode if we do not exercise self-restraint in the utilization of our power to negative the actions of the other branches." *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring).